## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KIMBERLY FORD, AS ADMINISTRATOR OF THE ESTATE OF DARRYL SHONIEF FORD AND CO-ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF DARRYL BOONE, DECEASED, et al.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COUNTY OF MERCER, et al.,**<br><br>**Defendants.** | **Civil Action No. 14-0648 (FLW)**<br><br><br><br>**OPINION** |

**WOLFSON, United States District Judge:**

### I.      INTRODUCTION

This civil rights action is brought by Plaintiffs under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA") on behalf of Plaintiffs and their decedent Darryl Boone (the "Decedent"), who was brutally assaulted and killed by his cellmate, Defendant Lamar Gaines, on October 5, 2013, while both men were detained at Mercer County Correctional Center ("MCCC"). Gaines allegedly had an extensive history of significant mental illness and violence at MCCC, and the fatal attack on Boone occurred just days after Gaines assaulted and allegedly attempted to kill his previous cellmate. Plaintiffs have sued the County of Mercer, the prison medical and health services provider, and a number of prison officials and medical personnel, alleging that these entities and individuals failed to protect the Decedent from Gaines.[1] The

---

[1] The Amended Complaint also alleges state law negligence claims against the medical defendants.

County Defendants have moved to dismiss the Amended Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).[2] For the reasons expressed in this Opinion, the Court grants the County Defendants' motion to dismiss the punitive damages claim against the County of Mercer, but otherwise denies without prejudice the motion to dismiss.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### a.   Factual Allegations Giving Rise to Section 1983 Claims

#### i.   Decedent Boone's Mental Health and Housing Issues

At the time of his death, Darryl Boone was a pretrial detainee at MCCC awaiting trial on a charge of vehicular manslaughter. The Amended Complaint alleges that Boone had mental health issues throughout his stay at MCCC and was experiencing depression, auditory hallucinations, and suicidal ideation. (ECF No. 44, Am. Compl. at ¶¶ 23-24.) Boone was evaluated and treated by Defendants Stanley George Malkin and Philip Torrance, psychiatrists employed by Defendant CFG Health Systems, LLC ("CFG"), which provides medical and mental health services to detainees and inmates at MCCC on a contractual basis. (*Id.* at ¶¶ 15, 24-40.) In the weeks leading up to the fatal assault, Boone was placed on suicide watch and his medications were increased. (*Id.* at ¶¶ 28-29.) Boone also apparently sought treatment for his own deteriorating mental health in the days prior to the assault, but his repeated requests for help were allegedly ignored by staff, including Defendants Malkin and Torrance. (*Id.* at ¶¶ 35-37.) On October 4, 2013, Boone was assigned to cell 8 in the general population.   (*Id.* at ¶ 40.) The following day, Boone was fatally assaulted in his cell by Defendant Gaines. (*Id.* at ¶ 111.)

---

[2] The moving Defendants are County of Mercer, Warden Charles Ellis, Cpt. Richard Bearden, Lt. Asia Paris, Sgt. Saul Walker, Sgt. Gary Victor, Corrections Officer James Kinley, Corrections Officer Dingle, and Corrections Officer Ronald McArthur (collectively referred to as the "County Defendants").

### ii. Defendant Gaines' Alleged History of Violence and Mental Illness at MCCC

The Amended Complaint alleges that Defendant Lamar Gaines, who was nineteen years old on October 5, 2013, had a long criminal history as a juvenile. At the time he assaulted and killed Boone, Gaines was housed at MCCC awaiting trial on First Degree Carjacking and Second Degree Robbery charges, stemming from an incident on February 1, 2012. (Am. Compl. at ¶¶ 41-48.) The Amended Complaint also lists six disciplinary charges for which Gaines was found guilty at MCCC, describing the "the majority of them [as] violent in nature." (*Id.* at ¶ 49.)

In the nine months prior to the attack on Boone, Gaines was treated at MCCC by Defendants Malkin and Torrance for significant mental health issues, including possible Schizophrenia, and suicidal and homicidal ideation. On January 10, 2013, Gaines told Malkin that he was not suicidal and that he did not want to be housed with anyone else at the jail. (*Id.* at ¶¶ 52.) Malkin concluded that Gaines "may act out to obtain his goal of single housing which he insists upon." (*Id.* at ¶¶ 53-54.) Gaines also told Malkin that he was hearing voices but declined medication, and Malkin concluded that Gaines was showing signs of "possible onset of Schizophrenia," a possibility which was also acknowledged by Torrance. (*Id.* at ¶¶ 55-56.) For the next few months, Gaines continued to refuse medication and behaved erratically and was placed on suicide watch on several occasions. On February 12, 2013, Gaines' mother told Dr. Malkin that her son had been diagnosed as Bipolar and Borderline Schizophrenic. (*Id.* at ¶ 63.) During the month of February, Gaines continued to refuse medicine and informed social worker Kelly that he "thinks about hurting others but can control himself." (*Id.* at ¶ 64.) Kelly had an emergency follow up with Gaines on February 24, 2013, because a Housing Unit Officer found a mask and bible that contained writings about killing and Satan. At the follow up, Gaines told Kelly that "he felt like hurting someone" and that "at anytime, [his cellmate] can come down

from [his] bunk and kill him." (*Id.* at ¶¶ 65-66.)  Kelly provided this information to Defendants

Malkin and Torrance. (*Id.* at ¶ 67.)  Gaines also told medical that voices were telling him to kill

someone, that he planned to kill someone with a shank, and that he planned to kill his "Bunkie"

that day or the next day. (*Id.* at 68.)   On February 25, 2013, Malkin had Gaines screened for

mental illness and homicidality and was able to place Gaines on a waiting list for Ann Klein

Forensic Center.  On March 6, 2013, Defendant Malkin evaluated Gaines and again determined

"possible Schizophrenia" and sought to have Gaines committed at Ann Klein.  (*Id.* at ¶ 71.)

Gaines was admitted to Ann Klein on March 7, 2013.  (*Id.* at ¶ 72.)  During his stay at

Ann Klein, Gaines allegedly refused medication and became assaultive, was observed making a

noose, and attacked another patient.  (*Id.* at ¶ 73.)   On September 9, 2013, Gaines was

discharged from Ann Klein and returned to MCCC.  (*Id.* at ¶ 74.)

Upon Gaines' return to MCCC, Defendant Torrance prescribed additional medication for

him, but it is alleged that Gaines only took his medication on six of the seventeen days leading

up to the attack on Boone.  (*Id.* at ¶¶ 75; 128.)  Upon his return to MCCC, Gaines was allegedly

permitted to walk around the detention floor, and he was housed with other inmates.   (*Id.* at ¶

78.)  On October 2, 2013, Gaines and another inmate followed Gaines' cellmate James Coleman

into the bathroom.  In the bathroom, Gaines "beat, choked, and tried to drown Mr. Coleman in

the 'slop sink' Gaines had previously clogged and filled with water," rendering Coleman

unconscious.  Defendant Asia Paris was the Lieutenant who first responded to the attack on

Coleman, who was taken to St. Francis Medical Center where he was hospitalized for five days.[3]

(*Id.* at ¶¶ 83-86.)

---

[3] A separate § 1983 suit related to the attack on Coleman is pending in this district. *See* Civil
Act. No. 15-6623-PSG-LHG.

As a result of the attack on Coleman, Gaines was charged with Aggravated Assault, Conspiracy, and Criminal Attempt to Commit Homicide. (*Id.* at ¶ 87.)  Gaines was also disciplined, found guilty of assault, and given a fifteen-day lockdown from October 2, 2013- October 16, 2013.  (*Id.* at ¶ 88.)  A few hours after the attack on inmate Coleman, Gaines allegedly told Casey Thompson, an RN working for CFG, that he was "homicidal." (*Id.* at ¶ 17.) Thompson placed Gaines on suicide watch and contacted Defendant Malkin.  (*Id.*)  That same day, Malkin met with Gaines, who denied suicidal and homicidal ideation.  Malkin allegedly removed Gaines from all watch and restrictions, despite the lockdown sanction, and without documenting on the electronic medical records recording system his justification for removing Gaines from suicide watch.[4]  (*Id.* at ¶¶ 92-93.)  That same day, Torrance evaluated Gaines and made no changes to his medication or diagnosis. (*Id.* at ¶ 94.)  At some point on October 4, 2013, Gaines was assigned to cell 8 with Boone.  (*Id.* at ¶ 95.)

The Amended Complaint specifically alleges that Defendant Malkin, as Gaines' treating psychiatrist, was aware of the circumstances surrounding Gaines' attempted murder of inmate Coleman on October 2, 2013, knew that Gaines was noncompliant with his medicine, and knew that Gaines had just been released from Ann Klein Forensic Center, where he was treated for homicidal ideation, but nevertheless removed Gaines from all watch and restrictions.  (*Id.* at ¶ 124.)  The Amended Complaint likewise avers that Defendant Torrance also had this same information, but did not override Defendant Malkin's decision to remove Gaines from all watch and restrictions.  (*Id.* at ¶¶ 125-26.)  The Amended Complaint does not explicitly state whether

---

[4] The Amended Complaint alleges that Malkin later claimed that he had documented his notes on a "confidential mental health suicide screening risk form" that was not part of Gaines' file.  (*Id.* at ¶¶ 120-123.)

Defendants Malkin or Torrance reported this information to any of the individual County

Defendants.

The Amended Complaint alleges, however, that each of the Individual Supervisory

Defendants, with the exception of Ellis, were responsible for supervising mental health services

and took part in classifying Gaines, thus determining where he would be housed at MCCC.  As

stated in the Amended Complaint, Defendant Bearden, as a Captain at MCCC,

> is responsible for the supervision of health services, including but
> not limited to, mental health services provided to inmates housed
> at the MCCC. . . . He is also responsible for implementing and/or
> execution of policies to ensure the safety and well-being of MCCC
> inmates [and for] screening and/or classification of detainees upon
> being processed into the MCCC, including descendant [sic] Darryl
> Boone and Lamar Gaines.  Defendant Bearden classified Boone
> and Gaines and was responsible for their placement within the
> facility, thereby determining the level of treatment and surveillance
> they would receive."

(ECF No. 44, Am. Compl. at ¶ 8.)  The Amended Complaint likewise alleges that Defendants

Asia Paris, Saul Walker, and Gary Victor were responsible for "supervision of health services

including, but not limited to, mental health services provided to inmates housed at the MCCC."

(*Id.* at ¶¶ 9-11.)  The Amended Complaint also alleges the following with respect to Paris,

Walker, and Victor:

> He is also responsible for screening and/or classification of
> detainees upon being processed into the MCCC, and who in fact
> classified (either together as a team or individually) decedent
> Boone and Gaines and was responsible for their placement within
> the facility, thereby determining the level of treatment and
> surveillance they would receive.

(*Id.*, Am. Compl. at ¶¶ 9-11.)   The Amended Complaint alleges that Defendant Charles Ellis, as

Warden of MCCC, is responsible for the creation and implementation of the policies concerning

screening, classification, and housing of inmates at MCCC, as well as the training and

supervision of facility personnel, including the areas of classification, housing, and mental health

services:

> [Ellis] was authorized to and was responsible for the formulation,
> establishment, and implementation, and enforcement of policies,
> procedures, practices and customs at the facilities regarding the
> detention, housing, and safety of the inmates, including Plaintiff's
> decedent.   Furthermore, he was responsible for the hiring, training,
> supervision, and discipline of all facility personnel.  Defendant
> Ellis was responsible for the day-to-day operation of the facility
> including the supervision and monitoring of the classification
> process, taking precautions taken [sic] to avoid injury to an inmate
> by another inmate, and providing all health services to the
> detainees at the MCCC.  He is ultimately responsible for the
> safety, care, and protection of all detainees housed at MCCC,
> including the decedent Darryl Boone.  He is being sued in his
> individual capacity.

(ECF No. 44, Am. Compl. at ¶ 7.)

The Amended Complaint also alleges that the County of Mercer, through its policymaker

Ellis, established deficient policies for segregating dangerous mentally ill inmates and failed to

provide appropriate training and supervision to MCCC and CGF staff regarding the

classification/housing of "known predators" and the treatment of inmates with serious mental

illnesses.  According to the Amended Complaint, the County of Mercer, through Warden Ellis,

> a.      Failed to establish policies, practices, and procedures to
> ensure that inmates at MCCC receive appropriate care for serious
> mental health illnesses;
>
> b.      Fail[ed] to ensure through training, supervision, and
> discipline that MCCC staff and CGF medical staff at MCCC to
> ensure that inmates receive mental health treatment, including
> making a referral for outside medical services;
>
> c.      [Entered] into a contractual agreement providing CFG and
> CFG medical staff with a strong financial disincentive to provide
> adequate mental health care;
>
> d.      Fail[ed] to establish policies, practices, and procedures to
> ensure that inmates are properly evaluated, classified, housed,

protected from inmates, protected from known predators, and receive appropriate care for serious mental health illnesses;

e.      Fail[ed] to ensure through training, supervision, and discipline of MCCC and CFG employees and agents to follow policies, practices, and procedures to ensure that inmates are properly evaluated, classified, housed, protected from inmates, protected from known predators, and receive appropriate care for serious mental health illnesses.[5]

(*Id.* at ¶ 139.)

### iii.   Gaines Fatally Attacks Darryl Boone in Cell 8

The Amended Complaint also details the circumstances surrounding Gaines' fatal attack on Boone on October 5, 2013.  Defendant Paris, the Lieutenant who responded to Gaines' attack on inmate Coleman, was the shift Commander on duty at MCCC.  (ECF No. 44, Am Compl. at ¶ 98.)  Defendants Walker and Victor were the sergeants assigned to supervise the corrections officers on duty.  (*Id.* at ¶¶ 105-06.)  Defendant Officer James Kinley was the Detention Floor Relief Officer assigned to the area including cell R8 where Boone and Gaines were housed.  (*Id.* at ¶ 97.)  Defendants Dingle and McArthur were the assigned corrections officers, and McArthur was also responsible for supervising the Detention Floor, including inmates who were on suicide watch. (Id. at (¶¶ 99-101.)

At some point on October 5, 2013, Defendant McArthur "heard yelling and observed inmates on the floor coming to their doors, banging their doors, making the unit loud."  This yelling went on "for awhile before [the inmates] calmed down," but McArthur did not inspect the floor in response to the yelling and banging. (*Id.* at ¶¶ 102-104.)  Other inmates allegedly reported hearing sounds of a struggle, including "bumping and screaming," "what sounded like someone was being choked, like a muffled gurgle with a high pitched sound, very loud."  The

---

[5] These allegations are also levied at CFG.

Amended Complaint further alleges that Defendant Kinley did not investigate the detention floor despite his acknowledgement that it was "really loud" and falsely indicated in a log book that he had conducted security checks every half hour on the detention floor. (*Id.* at ¶¶ 114-115.) According to the Amended Complaint, Defendant Kinley claimed he was making a routine security check when he discovered Boone lying on the floor and Gaines standing at the door. (*Id.* at ¶ 107.) Mr. Boone was pronounced dead at 2:15 am. (*Id.* at ¶ 108.)

Gaines allegedly stated that he had choked Boone while he was sleeping using a makeshift wire made from a bedsheet. Gaines then dragged Boone to the floor and stuffed him under the bed. He continued to choke Boone, who was making gurgling noises, and also poured toilet water in Boone's mouth in an attempt to drown him. Gaines then repeatedly smashed and stomped Boone's head on the concrete floor because he believed Boone was still alive. Gaines allegedly stated that it took him two hours to kill Boone. (*Id.* at ¶¶ 111.)

### b. Procedural History

Plaintiffs filed their initial Complaint on January 30, 2014, naming only the County of Mercer, Warden Charles Ellis, CFG Health Systems, LLC, and John Doe/Jane corrections officers and supervisors.[6] (ECF No. 1.) On January 29, 2015, Plaintiffs filed a motion for discovery of the medical, prison, and internal affairs records related to Gaines, Boone, and Coleman. (ECF No. 26.) On April 13, 2015, the Magistrate Judge granted in part and denied in part the motion for discovery, and ordered the County Defendants to produce decedent Boone's medical, prison, and internal affairs records, other than those as to which the County Defendants are asserting privilege. The Magistrate Judge further ordered the County Defendants to produce

---

[6] Defendant Mercer County filed an Answer to that Complaint on July 14, 2014 and asserted a third party Complaint against Lamar Gaines and a crossclaim against CFG. (ECF No. 15.)

Coleman's medical, prison, and internal affairs files related to his incarceration at the time of the alleged attack by Gaines, other than those as to which the County Defendants are asserting privilege, but denied Plaintiffs' request for additional files relating to Coleman's prior incarcerations.  The Court further ordered the County Defendants to produce all of third party Gaines' medical, prison, and internal affairs records, other than those as to which the County Defendants are asserting privilege, and further ordered that the County Defendants were to provide counsel for CFG with the opportunity to review the Gaines documents.  (ECF No. 33.)  The Court ordered that any motions to amend the pleadings or join new parties must be made by formal motion, submitted no later than June 1, 2015.  (Id.)  The Court subsequently extended that deadline until July 1, 2015.  (ECF No. 41.)

On July 1, 2015, Plaintiffs filed their Amended Complaint (ECF No. 44), which again named the County of Mercer, Warden Ellis, CFG, and also asserted claims against individual Defendants Bearden, Paris, Walker, Victor, Kinley, Dingle, McArthur, Malkin, Torrance, and Gaines.  (ECF No. 44.)  The County Defendants filed the instant motion to dismiss on behalf of Defendant County of Mercer and individual Defendants Ellis, Bearden, Paris, Walker, Victor, Kinley, Dingle, and McArthur (collectively "County Defendants").[7]  That motion is now fully briefed and ready for disposition.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted."  Fed. R .Civ. P. 12(b)(6).  On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no

---

[7] On August 4, 2015, CFG, Malkin, and Torrance filed their Answer to the Amended Complaint and Crossclaim.  (ECF No. 49.)

claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *United Van Lines, LLC v. Lohr Printing, Inc.*, No. CIV. 11–4761, 2012 WL 1072248, at *2 (D.N.J. Mar. 29, 2012).

When reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts first separates the factual and legal elements of the claims, and accepts all of the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create what amounts to a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Third Circuit has required a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.*; *see also Iqbal*, 556 U.S. 678–79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient

factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.   DISCUSSION

The gravamen of Plaintiff's Amended Complaint is that the County and CFG Defendants failed to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." [8] *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). The County Defendants contend that the failure to protect claims against them are deficient for two general reasons: (1) because *respondeat superior* cannot be a basis for § 1983 liability with respect to the County of Mercer and the Individual Supervisory Defendants; and (2) because the individual County Defendants are entitled to qualified immunity. The Court begins by instructing the County Defendants that, as movants, they bear the burden of demonstrating that Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted with respect to each Defendant. As discussed in more detail below, the legal arguments for dismissing the County of Mercer and the Individual Supervisory Defendants are generic and in large part fail to address any of the

---

[8] As a pretrial detainee, rather than a convicted prisoner, Decedent Boone retains liberty interests grounded in the Due Process Clause of the Fourteenth Amendment. *See Fuentes v. Wagner*, 206 F.3d 335, 341 n. 9 (3d Cir.), *cert. denied*, 531 U.S. 821 (2000). Practically speaking, however, courts have analyzed claims of failure to protect by pretrial detainees under the "deliberate indifference" standard set forth in Eighth Amendment jurisprudence, as the due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *Mohamed v. Aviles*, 2007 WL 923506, at *6 (D.N.J. March 26, 2007) (citing *Turner v. Cupp*, 238 F.3d 424, 2000 WL 1141423, at *2 (6th Cir. Aug.4, 2000)). In similar cases, the Third Circuit has indicated that deliberate indifference is the appropriate standard in the context of a Fourteenth Amendment failure-to-protect claim. *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 587 (3d Cir. 2004); *Hubbard v. Taylor*, 399 F.3d 150, 166 n. 22 (3d Cir. 2005) (applying Eighth Amendment doctrine to pretrial detainees raising claims of failure to protect and inadequate medical care); *see also Strobert v. Ocean Cty. Jail*, No. CIV.A. 07-3172 GEB, 2011 WL 63601, at *4 (D.N.J. Jan. 7, 2011) (explaining same).

specific facts pleaded in Plaintiffs' Amended Complaint.  The Court also notes that although the moving papers purport to seek dismissal on behalf of <u>all County Defendants</u>, the arguments for dismissal under Fed. R. Civ. P. 12(b)(6) address only the *Monell* and supervisory liability claims and do not address the sufficiency of the claims against Corrections Officer Defendants Kinley, Dingle, or McArthur.  As such, the Court does not address the whether the Amended Complaint states a claim for relief against those defendants and restricts its analysis to the sufficiency of the motion as to the remaining County Defendants, *i.e.*, the County of Mercer and the individual Supervisory Defendants Ellis, Bearden, Paris, Walker, and Victor.[9]

**a.  Plaintiffs' Section 1983 Claims**

**i.  Monell Claim Against the County**

The County Defendants argue that Plaintiffs fail to state a claim for relief against the County of Mercer because (1) "Plaintiffs [have] failed to articulate a policy or custom which caused the injuries to [Plaintiffs'] [D]ecedent," and (2) Plaintiffs have failed to alleged a pattern of prior similar incidents in their failure to train/supervise claim.  (ECF No. 48-1, Compl. at 5-6.)

It is well-settled that a municipality may be held liable under § 1983 only if its official policy or custom causes a constitutional injury.  *Monell v. New York Department of Social Services*, 463 U .S. 658, 694 (1978).  A governmental entity may not be held liable under § 1983 for constitutional violations caused solely by its employees or agents under the principle of *respondeat superior.  Id.* at 690; *see also McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (explaining that in *Monell* "the Supreme Court established that a municipality cannot be held liable under § 1983 for the constitutional torts of its employees by virtue of *respondeat*

_____

[9] Although the County Defendants' arguments for qualified immunity are equally generic, the Court will consider the qualified immunity arguments with respect to these Defendants.

*superior*."); *see also Carver v. Foerster*, 102 F.3d 96, 102–105 (3d Cir. 1996) (holding that a county is a local government unit under *Monell*).   Rather, in order for a governmental entity to be liable for the violation of a constitutional right under § 1983, the plaintiff must identify a policy or custom of the entity that caused the constitutional violation.[10]  *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997).  Thus, a complaint will be dismissed for failing to state a plausible claim under *Monell* if the plaintiff fails to specify the relevant policy or custom and simply paraphrases the elements of a *Monell* claim.  *See Wood v. Williams*, 568 F. App'x 100, 104 (3d Cir. 2014); *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d Cir. 2009).

Although complaints alleging municipal liability under § 1983 are not subject to heightened pleading standards, *see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, et al.*, 507 U.S. 163, 168 (1993), a plaintiff alleging municipal liability "must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan*, 564 F.3d at 658.  A plaintiff must also allege a "direct causal link between a [local government] policy or custom and the alleged constitutional deprivation."  *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 249 (3d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S.

---

[10] As a general matter, "there are two ways that a plaintiff can establish municipal liability under § 1983: [either] policy or custom." *Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007). "Under *Monell*, a plaintiff shows that a policy existed when a decision maker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Watson*, 478 F.3d at 155 (citation and internal quotations omitted). Alternatively, "[a] plaintiff may establish a custom . . . by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.  In other words, custom may be established by proving knowledge of, and acquiescence to, a practice." *Id.* at 155–56 (citation and internal quotations omitted).

378, 385 (1989)); *see also Mazariegos v. Monmouth Cty. Corr. Inst.*, No. CIV.A. 12-5626 FLW, 2014 WL 1266659, at *8 (D.N.J. Mar. 25, 2014).

Further, if the policy at issue "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222-24 (3d Cir. 2014) (citation and internal quotation marks omitted) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (citing *Bryan Cnty*, 520 U.S. at 410. Although "[o]rdinarily, '[a] pattern of similar constitutional violations by untrained employees'[11] is necessary 'to demonstrate deliberate indifference for purposes of failure to train,'" liability may be based on a single incident if the need for training is sufficiently obvious. [12] *Id.* at 223 (citing *Connick v. Thompson*, 563 U.S. 51, 64, (2011)

---

[11] The Third Circuit has explained the "pattern of violations" requirement as follows:

> Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.' *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1360 (2011). Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 407, 117 S.Ct. 1382.

[12] In *Canton*, the U.S. Supreme Court illustrated "single incident" failure-to-train liability with a hypothetical: a city arms its new police officers with firearms but fails to train them as to the constitutional limitations on the use of deadly force. *Canton*, 489 U.S. at 390 n. 10. As explained by another court in this District, "in this scenario, the need for such training would be 'so obvious' that the failure to train could provide a basis for the 'deliberate indifference' necessary

(reaffirming that in "rare" circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations")).  The Third Circuit has applied this "single-incident liability" theory to failure-to-train claims, but has recognized that it also applies "to other claims of [municipal] liability through inaction."  *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).  The Third Circuit has developed a three-part test for determining whether a failure to train or to implement a policy amounts to deliberate indifference, requiring that: "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 356 (3d Cir. 2008); *see also Thomas*, 749 F.3d 217 at 24 ("Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'") (citing *Bryan Cnty.*, 520 U.S. at 409).

Plaintiffs' theories of liability under *Monell* appear to involve both allegedly deficient policies and failures to train/supervise MCCC and CGF staff.  In resolving the motion to dismiss, the Court notes that the County Defendants' moving brief largely fails to analyze the specific allegations in the Amended Complaint that form the basis for the *Monell* claims, choosing instead to describe the allegations as "blanket conclusory boilerplate legal statements" and "bare conclusory statements" with no discussion of the allegations themselves.  (ECF No. 48-1,

---

to establish single-incident municipal liability." *Moriarty v. DiBuonaventura*, No. 14-CV-2492 JBS/AMD, 2014 WL 3778728, at \*5 (D.N.J. July 31, 2014) (citing *id.*).

Moving Br. at 6-7.)  In their brief in opposition to the County Defendants' Motion to Dismiss,

Plaintiffs contend that they have sufficiently alleged that

> County of Mercer, through its policymaker defendant Ellis, had a
> policy for segregating dangerous inmates that was constitutionally
> deficient.  In the alternative, the [Amended Complaint] established
> a plausible claim that the custom or practice of implementing the
> policy resulted in a constitutional injury. . . . [F]or well over a year,
> Gaines' [sic] developed an institutional record of severe mental
> illness, failure to take his medications, homicidal ideation, and
> assaultive behavior, the policy or custom at MCCC allowed Gaines
> to be released into general population multiple times.  This led
> directly to the attempted murder of [inmate] Coleman.  Even [after
> the attempted murder of inmate Coleman], the policy or custom of
> MCCC allowed Gaines to remain in general population and be
> housed with Boone, who he then brutally killed.

(ECF No. 53, Opposition at 12.)  Plaintiffs appear to suggest that Gaines' history, as detailed in

the Amended Complaint, may amount to a pattern of violations.  In the alternative, Plaintiffs

contend that they should be permitted to proceed under a single incident theory of liability with

respect to the failure to train claim because the need to provide training regarding the segregation

of homicidal, mentally ill inmates is obvious, and without such training, constitutional violations

are likely to recur.  (*Id.* at 13.)

The Court finds that at this early stage of the proceedings, Plaintiffs' Amended

Complaint sufficiently states at least one claim for *Monell* liability against the County based on

deficient policies regarding the segregation of dangerous, mentally ill inmates.  The Amended

Complaint identifies Defendant Ellis as the policy maker and alleges that the deficiencies in

MCCC's policies for classifying dangerous mental ill inmates permitted Gaines, who allegedly

had a significant history of mental illness and homicidal ideation, to be placed in the general

population with a cellmate on more than one occasion, even after Gaines assaulted and allegedly

attempted to kill his prior cellmate.

17

The Court also declines to dismiss the *Monell* claim based on failure to train because the County Defendants have not carried their burden to show that Plaintiffs fail to state a claim for relief based on either a pattern of violations or a single incident theory of liability.  In its reply brief, the County Defendants argue that *Connick* does not permit a failure to train based on the "single incident" of housing Defendant Gaines and Boones together, and that *Connick* permits "single incident" failure to train claims only in situations where the failure to train is "patently obvious" (ECF No.54, Reply at 6), but provide no further analysis of the facts alleged in the Amended Complaint.  As such, they have failed to meet their "burden of showing that no claim has been presented."  *Hedges*, 404 F.3d at 750.

For these reasons, the County Defendants' motion to dismiss the *Monell* claims against the County of Mercer is denied without prejudice at this time.

### ii.  Section 1983 Claims Against the Individual Supervisory Defendants

The County Defendants' motion also challenges whether Warden Charles Ellis, Capt. Richard Bearden, Lt. Asa Paris, Sgt. Saul Walker; and Sgt. Gary Victor (collectively "Individual Supervisory Defendants") had the requisite personal involvement in failing to protect Decedent Boone from Defendant Gaines.  (ECF No. 48-1, Moving Br. at 4.)   The County Defendants argue that the allegations in the Amended Complaint against the Individual Supervisory Defendants are grounded solely in theories of *respondeat superior* liability, and that the Amended Complaint fails to allege any facts showing that any the Individual Supervisory Defendants "were personally involved in the mental health services or housing of decedent or Defendant Lamar Gaines."  They also argue that the Amended Complaint includes no factual allegations supporting a claim for failure to train and instead offers "blanket assertions without supporting facts."  (ECF No. 48-1, Moving Br. at 4-5.)

18

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Thus, a section 1983 plaintiff must allege that each defendant was personally involved in the events constituting the plaintiff's claim.  *See Innis v. Wilson*, 334 F. App'x 454, 457 (3d Cir. 2009) (indicating that section 1983 plaintiff could not maintain claim against individual defendant unless said defendant was personally involved in actions causing the claim); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) (stating that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*").

In *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015), the Third Circuit outlined "two general ways" in which a supervisor-defendant may liable under the Eighth Amendment: (1) where the supervisor established a policy, custom, or practice that caused the harm; or (2) where the supervisor personally participated in the constitutional violation:

> [f]irst, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in the subordinate's unconstitutional conduct. *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995)).  "Failure to" claims – failure to train, failure to discipline, or, as in the case here, failure to supervise – are generally considered a subcategory of policy or practice liability.

*Id.*

With respect to the first type of claim, the Court in *Barkes* reaffirmed its four-part standard, established in *Sample v. Diecks*, for determining whether an official may be held liable on a § 1983 Eighth Amendment claim for implementing deficient policies.  *See id.* (citing *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989)).  Under *Sample*,

> [t]o hold a supervisor liable for such an Eighth Amendment violation, the plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure.

766 F.3d at 330.  As explained by the Court in *Barkes*, "[t]he essence of the type of claim [the Court] approved in *Sample* is that a state official, by virtue of his or her own deliberate indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment where there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur." 766 F.3d at 319-20.  Thus, deliberate indifference in the supervisory context may be demonstrated by "(i) showing that a supervisor failed to adequately respond to a pattern of past occurrences of injuries like the plaintiff['s] or (ii) by showing that the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials to respond will alone' support the finding that the two-part test is met." *Beers–Capitol*, 256 F.3d at 136–37 (emphasis added) (citing *Sample*, 885 F.2d at 1099).

The second type of supervisory liability outlined in *Barkes* is premised on the supervisor's personal participation in the constitutional violations or his or her knowledge and acquiescence in his or her subordinates' violations. 766 F.3d at 316-17.  "Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the

20

supervisor 'acquiesced' in ... the subordinate's conduct." *Bennett v. Washington*, No. CIV.A. 11-176, 2015 WL 731227, at *11 (E.D. Pa. Feb. 19, 2015) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir.1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 76–78 (2007)).

The County Defendants' moving brief provides only the basic legal test for the "knowledge and acquiescence" subtype of supervisory liability and fails to analyze the different types of supervisory liability in light of the allegations in Plaintiffs' twenty-seven page Amended Complaint.  Their motion papers also largely fail to consider the allegations <u>with respect to each of the Individual Supervisory Defendants</u>; rather, their moving brief simply argues in a blanket fashion that Plaintiff's "Amended [C]omplaint does not articulate facts to support the allegations that the supervisory officials were *personally involved* in the mental health services or housing of decedent or [D]efendent Lamar Gaines." (*Id.* at 4-5 (emphasis in original).)

In their reply brief, the County Defendants acknowledge *Barkes* and attempt to provide some factual arguments regarding several of the Individual Supervisory Defendants.  For instance, in support of its argument that *respondeat superior* cannot provide a basis for § 1983 liability, they assert that the fact that Defendants Bearden, Paris, Walker, and Victor were "on duty" on the night Gaines killed Boone cannot alone be a basis for liability under § 1983.[13] (ECF No. 54, Reply at 4.)  The Court does not disagree with this assessment; however, such allegations are not the "sole" allegations with respect to these Defendants.  For instance, the

---

[13] In their reply brief, the County Defendants also ask the Court to disregard the factual allegations in the Amended Complaint because they are based, at least in part, on an internal affairs report, which is "not a public document" and was not "authenticated." (ECF No. 54, Reply at 2.) This argument is misplaced.  Plaintiffs have not attached any documents to the Amended Complaint, and, at this stage of the proceedings, the Court need not consider the authenticity or reliability of documents that Plaintiffs relied on in drafting the Amended Complaint.

Amended Complaint also alleges that that Bearden, Paris, Walker, and Victor <u>actually classified</u> Boone and Gaines, thus determining where these particular detainees would be placed within the facility. (*See* ECF No. 44, ¶¶ 8-11.)

Crucially, the County Defendants' motion also fails to address whether there are sufficient facts to infer that any of the Individual Supervisory Defendants <u>had notice</u> of the deficient policies or the risk presented by Gaines.  "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  *Beers–Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001).   However, a plaintiff meets his burden of establishing the defendant's actual knowledge of serious risk "in the usual ways, including <u>inference from circumstantial evidence</u>." *Farmer*, 511 U.S. at 842 (emphasis added).  Furthermore, in some instances, "[a] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Beers-Capitol*, 256 F.3d at 131 (citing *Farmer*, 511 U.S. at 842).

On such a thinly prepared motion, the Court has no duty to perform the County Defendants' work in analyzing the sufficiency of the claims against the each of the Individual Supervisory Defendants.  *See Hedges*, 404 F.3d at 750 (explaining that "defendant bears the burden of showing that no claim has been presented" on a motion to dismiss).  Indeed, the Court will not comb through the Amended Complaint to make any arguments on the County Defendants' behalf.  Rather, the current motion to dismiss is denied without prejudice in this context, and the County Defendants may move to dismiss at the appropriate time with the proper legal arguments and citations to the Amended Complaint.

### iii.  Qualified Immunity

The County Defendants have also moved to dismiss the Amended Complaint on the basis of qualified immunity, arguing that even if a constitutional violation occurred, the individual County Defendants are each entitled to qualified immunity because they acted reasonably under the circumstances.  (ECF No. 48-1, Moving Br. at 9.)  The County Defendants offer the following explanation in support of what appears to be a collective request for qualified immunity:

> [The County] Defendants were not aware that decedent feared for his safety.  [Decedent Boone] did not make any complaints or statements to anyone at the Correction Center advising them that he was afraid of inmate Lamar Gaines.  He was properly housed with other inmates on the Detention floor which is consistent with the policy at the Correction Center.  Decedent did not file any grievances alleging that he was improperly housed or that he feared inmate Lamar Gaines.

(*Id.*)  The County Defendants further explain in their reply brief that the allegations in the Amended Complaint do not establish that "prison officials were aware of or even informed of any specific threat against decedent."[14] (*Id.* at 8.)

The Court disagrees that the individual County Defendants are entitled to qualified immunity on this basis; they suggest wrongfully that prison officials can be liable under a failure to protect theory only if the victim informed those officials that he faced a specific or personal threat from another inmate.  The general duty to protect inmates from assaults by other inmates is well established.  *See Farmer v. Brennan*, 511 U.S. 825 (1994).  Applying *Farmer* to the instant action, the first question is whether the Amended Complaint has alleged facts showing

---

[14] The County Defendants acknowledge in their reply brief that "the Fourteenth Amendment imposes a duty upon prison officials to protect inmates from violence at the hands of other prisoners, [but contend that] the law is not clearly established about housing these inmates, decedent and co-defendant Gaines together."  (ECF No. 54, Reply Br. at 7.)

that Boone in particular <u>or inmates in general</u> faced a substantial risk of assault.  The second

question is whether the Amended Complaint has alleged facts from which it could be inferred

that the individual County Defendants were aware of and disregarded that risk.  The fact that

Boone did not notify prison officials that he was afraid of Gaines and/or wanted to be separated

from Gaines is not dispositive here, because the facts alleged in the Amended Complaint suggest

that Gaines presented <u>a general threat</u> to inmates housed in the same cell with him.  As explained

by the Third Circuit in *Beers-Capitol*, 256 F.3d at 131-32, "*Farmer* made clear that a prison

official defendant cannot escape liability by showing that he did not know that this particular

inmate was in danger of attack: '<u>it does not matter . . . whether a prisoner faces an excessive risk

of attack for reasons personal to him or because all prisoners in his situation face such a risk.</u>'"

*Id.* (citing *Farmer*, 511 U.S. at 843) (emphasis added).[15]  As explained *supra*, the County

Defendants' motion fails to analyze the second question, *i.e.*, whether it can be inferred from the

facts alleged in the Amended Complaint that any of the individual County Defendants were

aware of and disregarded that risk.  At this time, however, none of the individual County

Defendants have established that they are entitled to qualified immunity.  As such, the request

for qualified immunity is denied without prejudice.

### b.  Punitive Damages Against the County of Mercer

Plaintiffs concede in their brief that punitive damages are not available against Defendant

County of Mercer under § 1983 or the New Jersey Civil Rights Act ("NJCRA").  (ECF No. 53,

---

[15] As explained by the Third Circuit, "*Farmer* emphasized further that, while a prison official's knowledge of an excessive risk of serious harm may be inferred from the fact that the risk is obvious, this inference is not compelled, as the official always must have an opportunity [on summary judgment or trial] to show that he was unaware of the risk."  *Id.* (citing at *Farmer*, 511 U.S. at 844).  Finally, the official who is actually aware of the risk to the prisoner can avert liability by showing that he responded reasonably to the risk, even if the ultimate harm was not avoided.  *See id.*

Opposition Br. at 15.)  As such, the Court dismisses with prejudice the claim for punitive

damages against the County of Mercer.

## V.    <u>CONCLUSION</u>

The County Defendants' motion to dismiss the punitive damages claim against the

County of Mercer in connection with the § 1983 and NJCRA claims is granted.  The motion is

otherwise denied without prejudice for the reasons stated in this Opinion.  An appropriate Order

follows.


<u>/s/ Freda L. Wolfson</u>
Freda L. Wolfson, U.S.D.J.


Date: February 26, 2016